**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| KAREN HOOVER, TOM BAKER, JED REIFER, MARK CAVE, GEOFFREY BRETON, and CEDRIC LENOX, individually and on behalf of all others similarly situated,<br><br>      Plaintiffs,<br><br>v.<br><br>CLEO AI INC.,<br><br>      Defendant. | No. 3:23-cv-01067-JKM<br><br>**CLASS ACTION** |

**FIRST AMENDED CLASS ACTION COMPLAINT**

Plaintiffs Karen Hoover, Tom Baker, Jed Reifer, Mark Cave, Geoffrey Breton, and Cedric Lenox ("Plaintiffs"), individually and on behalf of all others similarly situated, bring this action against Defendant Cleo AI Inc. ("Defendant" or "Cleo"), and allege as follows:

**NATURE OF THE ACTION**

1.      This case seeks damages, attorneys' fees, and costs for violations of the: Unfair Trade Practices and Consumer Protection Law ("UTPCPL"), 73 P.S. §§ 201-1, *et seq.*; Loan Interest and Protection Law ("LIPL"), 41 P.S. §§ 101, *et seq.*; Consumer Discount Company Act ("CDCA"), 7 P.S. §§ 6201, *et seq.*; Truth-in-Lending Act ("TILA"), 15 U.S.C. §§ 1601, *et seq.*; and Electronic Funds Transfer Act ("EFTA"), 15 U.S.C. §§ 1693, *et seq.*

1

## JURISDICTION AND VENUE

2.    The Court has subject matter jurisdiction. 28 U.S.C. §§ 1331, 1332(d).

3.    Venue is proper in this district. 28 U.S.C. § 1391.

4.    The Court has personal jurisdiction over Defendant because the claims at issue arose in this district and Defendant does substantial business in this district.

## PARTIES

5.    Hoover is a person residing in Lackawanna County, Pennsylvania.

6.    Baker is a person residing in Philadelphia County, Pennsylvania.

7.    Reifer is a person residing in Allegheny County, Pennsylvania.

8.    Cave is a person residing in Philadelphia County, Pennsylvania.

9.    Breton is a person residing in Lancaster County, Pennsylvania.

10.    Lenox is a person residing in Chester County, Pennsylvania.

11.    Cleo is a technology company headquartered in New York, New York.

12.    Cleo is not a bank and is not licensed under any Pennsylvania statute.

13.    Cleo makes cash advances to Pennsylvanians over the internet.

## FACTUAL ALLEGATIONS

*Cleo's Lending Practices*

14.    Cleo operates a lending app called "Cleo."

15.    The app provides cash advances to borrowers.

16.    The advances are to be repaid in a single installment.

2

17.   At first, cash advances are limited to $20.00 to $70.00.

18.   Over time, borrowers can obtain the ability to request cash advances in amounts up to $100.00.

19.   To be eligible for advances, borrowers must satisfy Cleo's underwriting criteria, and must link a bank account to the Cleo app.

20.   By issuing advances, Cleo obtains the right to automatically withdraw money from linked bank accounts, and to continue withdrawing funds until the cash advance and any other fees are repaid.

21.   Cleo advertises its advances as "free," "no interest," and "0% interest."

22.   This claim is untrue—Cleo's cash advances have significant costs.

23.   To obtain cash advances, Cleo charges a $5.99 to $14.99 monthly fee.

24.   To obtain cash advances quickly, Cleo charges a $3.99 "Express Fee."

25.   Most borrowers pay "Express Fees" because they need cash advances quickly—indeed, consumers use cash advance apps, like Cleo, specifically because they need cash quickly.

26.   Cleo's fees combine to create costly cash advances that yield triple digit APRs.

27.   For example, a $50.00 advance, with a $3.99 "Express Fee," a $5.99 monthly fee, and a two-week repayment schedule yields a 518% APR.

28.   The same advance with a $14.99 monthly fee yields a 986% APR.

3

29.     Cleo does not disclose the APRs of its advances before, during, or after any transaction, which allows Cleo to mislead borrowers to believe its cash advances are "free," "no-interest," and "0% interest."

***Cleo's Lending Practices Harm Pennsylvania Borrowers***

30.     The advances Cleo makes to Pennsylvania residents are merely payday loans that have been repackaged in a user-friendly app, and deceptively rebranded as "free," "no-interest," and "0% interest."

31.     The myriad harms caused by payday loans are well documented.

32.     Payday loans are a type of "balloon" loan, which means the principal, and any fee, interest, or other charge, are paid in a single amount at a specified time.

33.     Most payday loans are due to be paid on a borrower's payday, which is typically two weeks or less from the date a loan is issued.

34.     Cleo's cash advances similarly require full payment of the principal and any fees on payday.

35.     Traditional payday loans have triple digit APRs and are one of the most expensive forms of credit.

36.     Cleo's advances also have triple digit APRs. California Department of Financial Protection and Innovation, *Initial Statement of Reasons for the Proposed Adoption of Regulations under the California Consumer Financial Protection Law and the California Financing Law, California Deferred Deposit Transaction Law,*

4

*and California Student Loan Servicing Act* PRO 01-21, p. 62 (Mar. 15, 2023), *available at* https://dfpi.ca.gov/wp-content/uploads/sites/337/2023/03/PRO-01-21-ISOR.pdf ?emrc=e1ffd2 (finding that "[t]he APRs for companies [offering advances through cash advances apps] are generally similar to the average APRs for licensed payday lenders in California").

37.    The high fees associated with payday loans generally leave holes in the paychecks of borrowers, which leads to a cycle of reborrowing, where borrowers take out new loans to fill gaps created by old loans. *See, e.g.*, Center for Responsible Lending, *Phantom Demand: Short-term due data generates need for repeat payday loans, accounting for 76% of total volume*, p. 3 (July 9, 2009), *available at* https://www.responsiblelending.org/payday-lending/research-analysis/phantom-demand-final.pdf (finding only 2% of payday loans went to non-repeat borrowers); Consumer Financial Protection Bureau, *Payday Loans and Deposit Advance Products*, pp. 21-22 (Apr. 24, 2013), *available at* https://files.consumerfinance.gov/f/201304_cfpb_payday-dap-whitepaper.pdf (finding only 13% of borrowers took out 2 or less payday loans in a two month period).

38.    Cash advance apps, like Cleo, create these same holes and this same reborrowing cycle. *See, e.g.*, Cyrus Farivar, *Millions use Earnin to get cash before payday. Critics say the app is taking advantage of them*, NBC News (July 26, 2019), https://www.nbcnews.com/tech/internet/millions-use-earnin-get-cash-payday-critic

s-say-app-taking-n1034071 (detailing person who used app similar to Cleo and had no money left over after app debited account for repayment); Sidney Fussell, *The New Payday Lender Looks a Lot Like the Old Payday Lender*, The Atlantic (Dec. 18, 2019), https://www.theatlantic.com/technology/archive/2019/12/online-banking -lending-earnin-tip/603304/ (detailing person who used app similar to Cleo and fell into a "cycle of get paid and borrow, get paid and borrow").

39.     Further, the high fees charged on payday loans take money borrowers could have spent in the community, or used to cover necessities, liking buying food or paying rent, and transfer those funds to payday lenders.

40.     Cleo's advances, which impose fees similar to those imposed on payday loans, do the same thing.

41.     And despite the many similarities, Cleo's cash advances are even more harmful to borrowers than payday loans in one important respect.

42.     Unlike traditional payday lenders, which disclose the cost of their loans in terms of APR, Cleo never discloses the cost of its cash advances in terms of APR before, during, or after a consumer obtains credit.

43.     Because of this, most borrowers are unaware that they are agreeing to obtain credit at triple digit APRs, or that there are far cheaper forms of credit. *See, e.g.,* Cyrus Farivar, *Millions use Earnin to get cash before payday. Critics say the app is taking advantage of them*, NBC News (July 26, 2019), https://www.nbcnews

.com/tech/internet/millions-use-earnin-get-cash-payday-critics-say-app-taking-n10 34071 (detailing person who was unaware that app similar to Cleo had triple digit APRs); Laurence Darmiento, *His app lends money for free. But it will probably cost you*, LA Times (May 18, 2022), https://www.latimes.com/business/story/2022-05-18/dave-inc-jason-wilk-cash-advance-app (similar).

44.    Simply put, Cleo's business takes advantage of the lack of awareness of how Cleo's fees add up to make Cleo's advances more costly than other types of credit and just as costly as (if not more costly than) payday loans.

45.    Because the Pennsylvania Legislature viewed payday loans as harmful and unacceptable, the Legislature outlawed this form credit, as explained below.

### Cleo's Lending Practices Are Unlawful

46.    The Commonwealth of Pennsylvania "has a long history, dating back to colonial times, of outlawing annual interest rates above 6%." *Lutz v. Portfolio Recovery Assocs., LLC*, 49 F.4th 323, 329 (3d Cir. 2022).

47.    Today, that history is codified in the LIPL, which sets the maximum rate of interest at 6% for the loan or use of money. 41 P.S. § 201(a).

48.    The CDCA provides an exception to the LIPL, and allows those licensed under the CDCA to charge, collect, contract for, and receive interest and fees that yield APRs between 24% and 29% (depending on the term and size of the

loan and the interest, fees, or other amounts licensed lenders impose or receive).

7 P.S. §§ 6213, 6217.1.

49.    At the same time, the CDCA prohibits unlicensed persons that make or negotiate loans or advances of money or credit from charging, collecting, contracting for, or receiving any interest, fees, or other amounts that, in the aggregate, exceed 6%. 7 P.S. § 6203.A; *see also Lutz*, 49 F.4th at 329 (citing 7 P.S. § 6203.A and 41 P.S. § 201(a)).

50.    Cleo is not a CDCA licensee, which means it cannot charge, collect, contract for, or receive interest, fees, or other amounts that exceed 6%.

51.    Yet, as explained above, Cleo does just that.

52.    In fact, even if Cleo held a CDCA license, its cash advances would still be illegal because all of Cleo's advances have triple digit APRs, which far exceed the 24% to 29% APRs allowed for CDCA licensees.

53.    In short, payday loans with triple digit APRs, like Cleo's cash advances, have long been, and continue to be, unlawful in Pennsylvania.

**Cleo Cannot Evade Pennsylvania Law**

54.    Cleo may argue that its fees do not qualify as interest because they are voluntary, but "[t]he payment of usurious interest is usually voluntary[.]" *Marr v. Marr*, 20 A. 592, 593 (Pa. 1885); *Stock v. Meek*, 221 P.2d 15, 20 (Cal. 1950) ("The theory of [a usury] law is that society benefits by the prohibition of loans at excessive

8

interest rates, even though both parties are willing to negotiate them. Accordingly, 'voluntary' payments of interest do not waive the rights of the payors.")

55. Further, interest is defined as "compensation . . . for the use . . . of money." *Interest*, Black's Law Dictionary, p. 816 (7th ed. 1999).

56. Cleo's monthly fee, which must be paid to receive advances, and its "Express Fee," which must be paid to receive advances quickly, serve to compensate Cleo for the use of money and, therefore, qualify as interest.

57. Even if Cleo's fees do not qualify as interest, they still are prohibited because Pennsylvania law regulates any fee, charge, cost, or other amount charged, collected, contracted for, or received on a loan or advance of money or credit, or collected for the loan or use of money. 7 P.S. § 6203; 41 P.S. § 502.

58. Further, Pennsylvania law regulates fees, charges, and other amounts regardless of whether they are charged, collected, contracted for, or received on the amount loaned or advanced. *Pa. Dep't of Banking v. NCAS of Del., LLC*, 948 A.2d 752, 760-62 (Pa. 2008) (applying CDCA to monthly membership fees); *Roethlein v. Portnoff Law Assocs., Ltd.*, 81 A.3d 816 (Pa. 2013) (recognizing LIPL provides cause of action for "costs . . . incurred in connection with the loan or use of money"); *Glover v. Udren Law Offices, P.C.*, 139 A.3d 195 (Pa. 2016) (finding consumer could bring action under LIPL for "unearned and excessive attorney's fees").

59.    Cleo also may argue that it can evade Pennsylvania law because its cash advances do not qualify as "loans," "advances," or "the loan or use of money."

60.    These arguments should be rejected as well.

61.    "Loan" is defined as a "thing lent for the borrower's temporary use." *Loan*, Black's Law Dictionary, p. 947 (7th ed. 1999).

62.    "Advance" is defined as "money or goods furnished." *Advance*, Black's Law Dictionary, p. 53 (7th ed. 1999).

63.    Because Cleo's cash advances are money furnished, they qualify as "advances."

64.    And because Cleo's cash advances are money lent for temporary use, they also qualify as "loans."

65.    Cleo is a for profit business that advances cash to borrowers with the expectation that borrowers will repay the advance and fees in return for the privilege of obtaining the advance.

66.    Indeed, Cleo structured its business specifically to obtain repayment: before borrowers obtain advances, Cleo evaluates its ability to obtain repayment by automatically withdrawing funds from bank accounts; borrowers must link accounts and allow Cleo to automatically withdraw funds to obtain repayment; and Cleo will not issue more than one advance at a time, or issue additional advances until prior advances are repaid.

67.    Further, despite its advances being just as costly as (if not more costly than) payday loans, Cleo obtains repayment at rates that exceed those for payday loans. *See* Financial Health Network, *Earned Wage Access and Direct-to-Consumer Advance Usage Trends*, p. 2 (Apr. 2021), *available at* https://cfsi-innovation-files-2018.s3.amazonaws.com/wp-content/uploads/2021/04/26190749/EWA_D2C_Advance-_sage_Trends_FINAL.pdf (stating apps, like Cleo, obtain repayment 97% of the time).

68.    Cleo cannot evade Pennsylvania law by attempting to call its advances and fees something they are not. *Simpson v. Penn Disc. Corp.*, 5 A.2d 796, 798 (Pa. 1939) (citations and quotation marks omitted) ("The statute against usury forms a part of the public policy of the state and cannot be evaded by any circumvention or waived by the debtor[.] It is immaterial in what form or pretence the usurious interest is covered in the contract[.] As usury is generally accompanied by subterfuge and circumvention of one kind or another to present the color of legality, it is the duty of the court to examine the substance of the transaction as well as its form . . . [.] It is, indeed, wholly immaterial under what form or pretence usury is concealed, if it can by any means be discovered our courts will refuse to enforce its payment."); *see, e.g.*, *Walnut Disc. Co. v. Weiss*, 208 A.2d 26, 28 (Pa. Super. 1965) (looking through form of transaction, evaluating its substance, and finding it illegal); *Saunders v. Resnick*, 16 A.2d 676 (Pa. Super. 1940) (same); *Moll v. Lafferty*, 153 A. 557, 558-

59 (Pa. 1931) (same); *see also Scott v. Lloyd*, 34 U.S. 418, 446-47 (1835) ("The ingenuity of lenders has devised many contrivances, by which, under forms sanctioned by law, the [usury] statute may be evaded. . . . Yet it is apparent, that if giving this form to the contract will afford a cover which conceals it from judicial investigation, the [usury] statute would become a dead letter. Courts, therefore, perceived the necessity of disregarding the form, and examining into the real nature of the transaction.").

69.     The Pennsylvania Legislature passed the LIPL and CDCA specifically to prevent the types of schemes at issue in this case. *Smith v. Mitchell*, 616 A.2d 17, 20 (Pa. Super. 1992) (stating purpose of LIPL is "to protect the citizenry of this Commonwealth from being exploited at the hands of unscrupulous individuals seeking to circumvent the law at the expense of unsuspecting borrowers who may have no other avenue to secure financial backing").

***Facts Relevant to Plaintiffs***

70.     Plaintiffs have obtained various cash advances through the Cleo app.

71.     The advances were for personal, family, and/or household purposes.

72.     Plaintiffs paid monthly fees and "Express Fees."

73.     The fees Plaintiffs paid, in the aggregate, exceeded 6%.

74.     Cleo did not disclose the cost of any advance Plaintiffs obtained.

75.     Plaintiffs were unaware of the cost of Cleo's cash advances.

12

76.     Plaintiffs seek to obtain, on behalf of themselves and the class, $100 for each advance obtained, three times the amount of any fees or other charges on each advance, and all of the other relief detailed below.

## CLASS ACTION ALLEGATIONS

77.     Plaintiffs bring this action individually and on behalf of all others similarly situated under Rule 23 of the Federal Rules of Civil Procedure.

78.     Plaintiffs seek to certify the following class: "All persons who obtained a cash advance from Defendant with a Pennsylvania address and paid a monthly fee, 'Express Fee,' or any other interest, fee, charge, cost, or amount."

79.     Plaintiffs reserve the right to expand, narrow, or otherwise modify the class as the litigation continues and discovery proceeds.

80.     Fed. R. Civ. P. 23(a)(1): The class is so numerous that joinder is impracticable. There are thousands of members of the class. The class is identifiable by the records of Defendant and Plaintiffs and the class members.

81.     Fed. R. Civ. P. 23(a)(2), (b)(3): Plaintiffs and the class members share numerous common questions of law and fact that will drive the resolution of the litigation and predominate over individual issues. For example, there is a single common answer to whether Defendant can charge, collect, contract for, and receive interest and fees that aggregate in excess of the rates and amounts set forth in the

13

LIPL or CDCA. This question, and other common questions, predominate over any individual issues.

82.     Fed. R. Civ. P. 23(a)(3): Plaintiffs' claims are typical of the claims of the members of the class because the claims of Plaintiffs and the class are based on the same legal theories and arise from the same conduct.

83.     Fed. R. Civ. P. 23(a)(4): Plaintiffs are adequate representatives of the class because the interests of Plaintiffs and the class align. Plaintiffs will fairly, adequately, and vigorously represent and protect the interests of the class and have no interest antagonistic to the class. Plaintiffs retained counsel who are competent and experienced in the prosecution of class action litigation generally and consumer finance litigation specifically.

84.     Fed. R. Civ. P. 23(b)(3): Given the complexity and nature of the issues presented and the relief requested, the expense and time necessary to obtain such relief, and the anticipated recovery and relief Plaintiffs and the class members may obtain, the class action mechanism is by far the preferred and most efficient litigation mechanism to adjudicate the claims of Plaintiffs and the class. Further, requiring Plaintiffs and the class members to file individual actions would impose a crushing burden on the court system and almost certainly lead to inconsistent judgments. Class treatment presents far fewer management difficulties and provides benefits of a single adjudication and economies of scale.

**COUNT I**
**Violation of the Unfair Trade Practices and Consumer Protection Law**
**73 P.S. §§ 201-1, *et seq.***

85.    This claim is brought individually and on behalf of the class.

86.    Plaintiffs, the class members, and Defendant are persons, the advances at issue were used to buy goods or services for personal, family, and/or household use, and Defendant's conduct is trade or commerce under the UTPCPL. 73 P.S. §§ 201-2(2), (3), 201-9.2.

87.    The conduct at issue in this case constitutes unfair methods of competition or unfair or deceptive acts or practices under the UTPCPL because Defendant: caused a likelihood of confusion or misunderstanding as to the source, sponsorship, approval, or certification of goods or services; caused a likelihood of confusion or misunderstanding as to affiliation, connection or association with, or certification by, another; represented that goods or services had sponsorship, approval, characteristics, ingredients, uses, benefits or quantities that they did not have; and engaged in fraudulent or deceptive conduct which created a likelihood of confusion or misunderstanding. *Id.* §§ 201-2(4)(ii), 201-2(4)(iii), 201-2(4)(v), 201-2(4)(xxi).

88.    More specifically, Defendant's conduct is unfair or deceptive because, among other things, Defendant's fees are sham interest, Defendant's advances are offered at an excessive rate of interest and fees, Defendant's advances have high

15

costs, despite Defendant's claim that it makes no-cost advances, Defendant is not a lawful lender offering lawful cash advances, despite Defendant's implications to the contrary, and Defendant cannot charge, collect, contract for, or receive the fees it charges, despite Defendant's implication to the contrary. *Pa. Dep't of Banking v. NCAS of Del., LLC*, 995 A.2d 422, 442-44 (Pa. Cmwlth. 2010) (finding claim for relief stated under UTPCPL where complaint alleged that a payday lender "offer[ed] a line of credit product . . . at an excessive rate of interest").

89.    Defendant's use of unfair methods of competition or unfair or deceptive acts or practices in the conduct of trade or commerce violates 73 P.S. § 201-3.

90.    Plaintiffs and the class members lost money or property as a result of Defendant's violations and, therefore, are entitled to actual damages, statutory damages, treble damages, and all other available relief under 73 P.S. § 201-9.2, as well as reasonable costs and attorneys' fees, and such additional relief the Court deems necessary or proper.

## COUNT II
### Violation of the Loan Interest and Protection Law
### 41 P.S. §§ 101, *et seq.*

91.    This claim is brought individually and on behalf of the class.

92.    Plaintiffs and the class members are persons who paid a rate of interest in excess of that provided for by the LIPL and CDCA, and who paid charges prohibited or in excess of those allowed by the LIPL and CDCA.

93. Defendant collected from Plaintiffs and the class members interest in excess of that provided for by the LIPL and CDCA, and charges prohibited or in excess of those allowed by the LIPL and CDCA.

94. The LIPL provides for, among other things, damages, declaratory and injunctive relief, and attorneys' fees and costs. 41 P.S. §§ 501, 502, 503.

95. Accordingly, the Court should issue an order: awarding any excess interest, fees, or other charges collected by Defendant; awarding triple the amount of any excess interest, fees, or other charges collected by Defendant; awarding attorneys' fees and costs; and awarding all other relief that is necessary and proper.

## COUNT III
### Violation of the Consumer Discount Company Act
### 7 P.S. §§ 6201, *et seq.*

96. This claim is brought individually and on behalf of the class.

97. Defendant is in the business of negotiating, making, or arranging loans or advances, is not a bank, and is not licensed under any Pennsylvania statute.

98. Consequently, Defendant could not charge, collect, contract for, or receive more than 6% combined interest, fees, or other charges on loans or advances issued in amounts under $25,000. 7 P.S. § 6203; 41 P.S. § 201(a).

99. Defendant, however, charged, collected, contracted for, or received interest, fees, or other charges above this amount.

17

100.    Equitable relief is available to private parties under the CDCA. *Mellish v. CACH, LLC*, No. 19-cv-01217, 2020 U.S. Dist. LEXIS 52383, at *7 (W.D. Pa. Mar. 26, 2020) ("If a private civil litigant seeks enforcement of the CDCA, the available remedy is equitable[.]").

101.    Accordingly, the Court should issue an order: awarding restitution in the amount of any interest, fees, or other charges that Defendant charged, collected, contracted for, or received in excess of 6%; awarding attorneys' fees and costs; and awarding all other relief that is necessary and proper.

## COUNT IV
### Violation of the Truth-In-Lending Act
### 15 U.S.C. §§ 1601, *et seq.*

102.    This claim is brought individually and on behalf of the class.

103.    Defendant is a "creditor," Plaintiffs' and the class members' cash advances are "consumer credit transactions," and Plaintiffs, Defendant, and the class members are "persons" within the meaning of TILA. 15 U.S.C. §§ 1602(e), (f), (g), (i).

104.    TILA required Defendant to disclose the: "amount financed"; "finance charge"; "annual percentage rate"; and "total of payments." *Id.* §§ 1638(a)(2), (3), (4), (5).

18

105.   The purpose of these disclosure requirements is to ensure a meaningful disclosure of credit terms to protect consumers against unfair credit practices and to ensure consumers avoid the uninformed use of credit. *Id.* § 1601(a).

106.   Defendant failed to disclose, among other things, the "amount financed," "finance charge," "annual percentage rate," "total of payments," and payment schedule to Plaintiffs and the class members.

107.   Indeed, at no time before, during, or after Plaintiffs or any class member obtained a loan or advance did Defendant disclose any of the above terms.

108.   Because Defendant failed to comply with various requirements imposed by TILA, Defendant is liable to Plaintiffs and the class members in an amount equal to actual damages, statutory damages, costs, reasonable attorneys' fees, and all other available relief. *Id.* § 1640(a).

## COUNT V
**Violation of the Electronic Funds Transfer Act**
**15 U.S.C. §§ 1693, *et seq.***

109.   This claim is brought individually and on behalf of the class.

110.   Plaintiffs and the class members are "consumers," Defendant's cash advances are "extensions of credit," the bank accounts Plaintiffs and the class members were required to link to Defendant's app are "accounts," and the withdraws Defendant made from the accounts of Plaintiffs and the members of the class are

19

"preauthorized electronic fund transfers" within the meaning of the EFTA. 15 U.S.C. §§ 1693a(2), (6), (10).

111.    Defendant violated the EFTA by conditioning its extension of credit on repayment by means of preauthorized transfers. *Id.* § 1693k(1).

112.    Defendant also violated the EFTA by failing to obtain written authorization and/or by failing to provide Plaintiffs and the class members a copy of the written authorization for the preauthorized transfers. *Id.* § 1693e(a).

113.    Because Defendant failed to comply with the requirements imposed by the EFTA, Defendant is liable to Plaintiffs and the class members in an amount equal to actual damages, statutory damages, costs, reasonable attorneys' fees, and all other available relief. *Id.* § 1693m(a).

## **JURY TRIAL DEMANDED**

Plaintiffs request a jury trial on all claims so triable.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for the following relief:

a. An order certifying the proposed class, appointing Plaintiffs as representatives of the proposed class, and appointing undersigned counsel as counsel for the proposed class;

b. An order awarding actual, statutory, treble, and all other damages available by law, along with pre- and post-judgment interest;

c. An order providing Plaintiffs and the class members restitution for any interest, fees, or other charges that were paid to Defendant and that aggregated in excess of 6%;

d. An order awarding attorneys' fees and costs;

e. An order declaring Defendant's conduct unlawful; and

f. An order awarding all other relief that is just, equitable, and appropriate.

Respectfully Submitted,

Dated: January 2, 2024     By:    */s/ Kevin Abramowicz*
Kevin Abramowicz (PA 320659)
Kevin Tucker (PA 312144)
Chandler Steiger (PA 328891)
Stephanie Moore (PA 329447)
**East End Trial Group LLC**
6901 Lynn Way, Suite 215
Pittsburgh, PA 15208
Tel: (412) 223-5740
Fax: (412) 626-7101
kabramowicz@eastendtrialgroup.com
ktucker@eastendtrialgroup.com
csteiger@eastendtrialgroup.com
smoore@eastendtrialgroup.com

*Attorneys for Plaintiffs*

22