UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF PENNSYLVANIA

KAREN HOOVER, et al.,

Plaintiffs,

v.

CLEO AI, INC.,

Defendant.

CIVIL ACTION NO. 3:23-CV-01067

(MEHALCHICK, J.)

**MEMORANDUM**

Plaintiffs Karen Hoover ("Hoover") and Tom Baker ("Baker")[1] initiated this action on behalf of themselves and all others similarly situated by filing a complaint on June 27, 2023, against Defendant Cleo AI, Inc. ("Cleo"). (Doc. 1). On September 13, 2023, Cleo filed a motion to compel arbitration. (Doc. 11). On January 2, 2024, after Cleo's motion was fully briefed, Hoover, Baker, and additional Plaintiffs Jed Reifer ("Reifer"), Mark Cave ("Cave"), Geoffrey Breton ("Breton"), and Cedric Lenox ("Lenox") (collectively, "Plaintiffs") filed the operative amended complaint. (Doc. 20). In response, Cleo filed another motion to compel arbitration. (Doc. 21). On May 20, 2024, the Court stayed this action pending the Pennsylvania Supreme Court's resolution of *Chilutti v. Uber Technologies Inc.* (Doc. 33). On February 26, 2026, after the Pennsylvania Supreme Court resolved *Chilutti*, the parties requested the Court lift its stay and deny the pending motions as moot because Hoover, Baker, and Breton agreed to withdraw their claims and thus, the only remaining plaintiffs are Reifer,

---

[1] Vera Beckford was also a plaintiff in the original complaint but voluntarily dismissed her claim on September 11, 2023. (Doc. 9).

Cave, and Lenox (collectively, "Remaining Plaintiffs"). (Doc. 43, at 3). On March 2, 2026, the Court dismissed Hoover, Baker, and Breton's claims without prejudice and denied the previous motions to compel arbitration as moot. (Doc. 44). Before the Court is Cleo's current motion to stay this action pending arbitration[2] or, alternatively, dismiss this matter for improper venue. (Doc. 47). For the reasons provided herein Cleo's motion will be **GRANTED in part** and **DENIED in part**. (Doc. 47).

I.    BACKGROUND AND PROCEDURAL HISTORY

The following factual summary is taken from the amended complaint and the parties' filings related to the instant motion. Cleo is a New York based technology company that operates a lending app called "Cleo." (the "App"). (Doc. 20, ¶¶ 12-14). The App provides consumers with cash advances and charges a subscription fee of $5.99 to $14.99 a month. (Doc. 20, ¶¶ 15-23). Cleo allegedly advertises that it charges zero percent interest for the App's cash advances. (Doc. 20, ¶ 21). However, Remaining Plaintiffs assert that Cleo charges a $3.99 "Express Fee" for users to obtain their cash advances more quickly and annual percentage rates ("APRs") which can reach up to 986%. (Doc. 20, ¶¶ 24-28). According to Remaining Plaintiffs, Cleo does not disclose the APRs prior to any transactions on the App. (Doc. 20, ¶ 29). Remaining Plaintiffs are users of the App who paid Cleo's monthly fees, the Express Fee, and APRs. (Doc. 20, ¶¶ 70-76). Remaining Plaintiffs bring this action individually and on behalf of "[a]ll persons who obtained a cash advance from [Cleo] with a Pennsylvania address and paid a monthly fee, 'Express Fee,' or any other interest, fee, charge, cost, or amount." (Doc. 20, ¶ 78).

---

[2] Cleo now only requests the Court stay this action pending arbitration rather than compel arbitration. (Doc. 48, at 51-52).

According to Cleo's data records, when Remaining Plaintiffs sought a cash advance from Cleo, they first encountered a page which linked to Cleo's terms of services and the terms of service of Synapse Financial Technologies Inc. ("SynapseFi"), a company Cleo partnered with "to serve as the conduit between Cleo's banks and its users' banks." (Doc. 48, at 10; Doc. 48-3, at 6-18). Remaining Plaintiffs saw a page in which users were required to enter their address and phone number and press a big blue button that said "continue." (Doc. 48-3, at 6-18, 32). Above where users entered their information, the page included text stating, "SynapseFi is our backend software provider and partner of Evolve Bank & Trust (Evolve), member FDIC. SynapseFI's API, and their relationship with Evolve, enables us to offer banking services and products. By agreeing to Cleo's TOS and Privacy Policy, you also agree to SynapseFI's policies below." (Doc. 48-3, at 32). The terms "Cleo's TOS" and "Privacy Policy" were in blue text and hyperlinked. (Doc. 48-3, at 32). Beneath this text were two other hyperlinks in blue text stating the words "Terms of Service" and "Privacy Policy." (Doc. 48-3, at 32). The links led to each respective agreement and SynapseFI's terms of service included an arbitration provision. (Doc. 48-2, at 5, 80-81, 89-90; Doc. 48-3, at 32).

Cleo's data records show that on April 28, 2025, Lenox used the App again and encountered a screen which read in bolded letters "[t]he T&C's have changed" at the top of the screen. (Doc. 48-2, at 6-7, 95). Similarly, Cleo's data records further show that on September 10, 2025, Reifer used the App and encountered a similar screen with the same text at the top. (Doc. 48-2, at 7-8, 100). On both screens, under the above-mentioned text, the screens stated "[r]ead some legal stuff to keep using Cleo" and then contained a page with Cleo's entire then-current terms of service which users could scroll through. (Doc. 48-2, at 6, 8, 95, 100). Below the terms of service was a box with a big button with: "I agree" (Doc. 48-

2, at 95, 100). Above, "I agree" was text stating "[b]y clicking 'I agree,' I've read and agree to be bound by Cleo's Terms and Conditions which includes, among other provisions, a binding arbitration clause and a waiver of class action rights." (Doc. 48-2, at 95, 100). These screens were presented to all users of the App who wanted to continue using the App but had not yet consented to the then-current terms of service. (Doc. 48-2, at 6-7). Cleo's records show that both Lenox and Reifer clicked "I agree" on their respective screens. (Doc. 48-2, at 7-8).

Remaining Plaintiffs allege violations of the Unfair Trade Practices and Consumer Protection Law, the Loan Interest and Protection Law, the Consumer Discount Company Act, the Truth-In-Lending Act, and the Electronic Funds Transfer Act. (Doc. 20). On April 6, 2026, Cleo filed its motion to stay this action pending arbitration, or in the alternative, dismiss this action along with a brief in support. (Doc. 47; Doc. 48). On May 4, 2026, Remaining Plaintiffs filed a brief in opposition. (Doc. 51). On May 18, 2026, Cleo filed a reply brief. (Doc. 52). Accordingly, this matter is ripe and ready for disposition.

## II.   LEGAL STANDARDS

### A. MOTION TO STAY PENDING ARBITRATION

"It is well established that the Federal Arbitration Act (FAA), reflects a 'strong federal policy in favor of the resolution of disputes through arbitration.'" *Kirleis v. Dickie, McCamey & Chilcote, P.C.*, 560 F.3d 156, 160 (3d Cir. 2009) (quoting *Alexander v. Anthony Int'l, L.P.*, 341 F.3d 256, 263 (3d Cir. 2003)). However, "the cardinal principle of the law of arbitration is that 'under the [Federal Arbitration Act, arbitration] is a matter of consent, not coercion, and parties are generally free to structure their arbitration agreements as they see fit.'" *Gay v. CreditInform*, 511 F.3d 369, 388-89 (3d Cir. 2007) (quoting *Volt Info. Sciences, Inc. v. Bd. of Trustees of the Leland Stanford Junior Univ.*, 489 U.S. 468, 479 (1989)). The Federal Arbitration

Act (the "FAA") provides that "[a] written provision in any . . . contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity. . ." 9 U.S.C. § 2. The Supreme Court has interpreted the FAA to require courts to "rigorously enforce arbitration agreements according to their terms, including terms that 'specify with whom the parties choose to arbitrate their disputes,' and 'the rules under which that arbitration will be conducted.'" *Am. Exp. Co. v. Italian Colors Restaurant*, 570 U.S. 228 (2013) (internal citations omitted); *see MacDonald v. CashCall, Inc*, 883 F.3d 220, 226 (3d Cir. 2018). "Federal law determines whether an issue governed by the FAA is referable to arbitration." *Harris v. Green Tree Fin. Corp.*, 183 F.3d 173, 178 (3d Cir. 1999). "Questions concerning the interpretation and construction of arbitration agreements are determined by reference to federal substantive law." *Harris*, 183 F.3d at 179; *see Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 26 (1983) (stating "[the FAA] creates a body of federal substantive law establishing and regulating the duty to honor an agreement to arbitrate").

Section 2 of the FAA sets forth the basic rule of federal law:

> A written provision in . . . a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction, or the refusal to perform the whole or any part thereof . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.
>
> 9 U.S.C. § 2.

Nevertheless, notwithstanding the supremacy of federal law, courts look to ordinary state law principles of contract formation to make this determination. *See Alexander*, 341 F.3d at 264; *see also Gay,* 511 F.3d at 388.

To stay a matter pending arbitration, a court must determine (1) the validity of the arbitration agreement and (2) whether the dispute falls within the scope of that agreement. *See Trippe Mfg. Co. v. Niles Audio Corp.*, 401 F.3d 529, 532 (3d Cir. 2005); *see also Bey v. Citi Health Card*, Civ. Action No. 15-6533, 2017 WL 2880581, at *4–5 (E.D. Pa. July 6, 2017). Under the Supreme Court's longstanding severability rule, "a party cannot avoid arbitration by attacking the contract containing the arbitration clause as a whole (the 'container contract'). Rather, the party opposing arbitration must challenge 'the arbitration clause itself.'" *MZM Constr. Co., Inc. v. New Jersey Bldg. Laborers Statewide Benefit Funds*, 974 F.3d 386, 397 (3d Cir. 2020) (quoting *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 403 (1967)). When "[a]pplying the relevant state contract law, a court may also hold that an agreement to arbitrate is 'unenforceable based on a generally applicable contractual defense, such as unconscionability.'" *Parilla v. IAP Worldwide Servs., VI, Inc.*, 368 F.3d 269, 276 (3d Cir. 2004) (quoting *Alexander*, 341 F.3d at 264); *see Gay*, 511 F.3d at 388 ("[G]enerally applicable contract defenses, such as fraud, duress, or unconscionability, may be applied to invalidate arbitration agreements without contravening [the FAA]" (quoting *Doctor's Assocs., Inc. v. Casarotto*, 517 U.S. 681, 687, (1996)).

"The Third Circuit has established a two-tiered framework for assessing motions to compel [or stay pending] arbitration." *Lloyd v. Retail Equation, Inc.*, No. CV 21-17057, 2022 WL 18024204, at *4 (D.N.J. Dec. 29, 2022) (citing to *Guidotti v. Legal Helpers Debt Resolution, L.L.C.*, 716 F.3d 764 (3d Cir. 2013)). First, "when it is apparent, based on the face of a complaint, and documents relied upon in the complaint, that certain of a party's claims are subject to an enforceable arbitration clause, a motion to compel arbitration should be considered under a Rule 12(b)(6) standard without discovery's delay." *Guidotti*, 716 F.3d at

776 (citations and internal quotations omitted); *see Lepore v. SelectQuote Ins. Servs., Inc.*, No. 22-3390, 2023 WL 8469761, at *2 (3d Cir. Dec. 7, 2023). "But if the complaint and its supporting documents are unclear regarding the agreement to arbitrate, or if the plaintiff has responded to a motion to compel [or stay pending] arbitration with additional facts sufficient to place the agreement to arbitrate in issue, then the parties should be entitled to discovery on the question of arbitrability before a court entertains further briefing on [the] question." *Guidotti*, 716 F.3d at 776 (quotation marks omitted). "To proceed otherwise would plainly disadvantage moving parties because they would be limited to the complaint, exhibits attached to the complaint, matters of public record, and undisputedly authentic documents relied upon by the complaint, even when non-moving parties introduced and relied on other evidence in opposition." *Robert D. Mabe, Inc. v. OptumRX*, 43 F.4th 307, 330 (3d Cir. 2022). After this, the Court may entertain a renewed motion to stay pending arbitration, this time judging the motion under the summary judgment standard of Rule 56. *Guidotti*, 716 F.3d at 776.[3] In the event that summary judgment is not warranted because "the party opposing arbitration can demonstrate, by means of citations to the record," that there is "a genuine dispute as to the enforceability of the arbitration clause," the "court may then proceed summarily to a trial regarding 'the making of the arbitration agreement or the failure, neglect,

---

[3] Several courts within this district have denied motions to compel arbitration and ordered limited discovery where the issue of arbitrability was not apparent on the face of the complaint, properly applying *Guidotti*. *See, e.g.*, *Reaser v. Credit One Financial*, No. 3:15-CV-1765, 2016 WL 245541, at *3 (M.D. Pa. Jan. 21, 2016); *Potts v. Credit One Financial*, No. 3:15-CV-1119, 2016 WL 225678, at *5 (M.D. Pa. Jan. 19, 2016) (allowing sixty (60) day limited discovery on the issue of arbitrability); *Rajput v. Credit One Financial*, No. 1:15-cv-00807, 2015 WL 8012938, at *3 (M.D. Pa. Dec. 12, 2015); *Briggs v. Macy's Inc.*, No. CV 3:16-0902, 2017 WL 590274, at *1 (M.D. Pa. Feb. 14, 2017).

or refusal to perform the same,' as Section 4 of the FAA envisions." *Somerset Consulting, LLC v. United Cap. Lenders, LLC,* 832 F. Supp. 2d 474 (E.D. Pa. 2011) (quoting 9 U.S.C. §4).

B. Motion for Summary Judgment[4]

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment should be granted only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" only if it might affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute of material fact is "genuine" if the evidence "is such that a reasonable jury could return a verdict for the non-moving party." *Anderson*, 477 U.S. at 248. In deciding a summary judgment motion, all inferences "should be drawn in the light most favorable to the non-moving party, and where the non-moving party's evidence contradicts the movant's, then the non-movant's must be taken as true." *Pastore v. Bell Tel. Co. of Pa.*, 24 F.3d 508, 512 (3d Cir. 1994). However, a party opposing a summary judgment motion must comply with Local Rule 56.1, which specifically directs the oppositional party to submit a "statement of the material facts, responding to the numbered paragraphs set forth in the statement required [to be filed by the movant], as to which it is contended that there exists a genuine issue to be tried"; if the nonmovant fails to do so, "[a]ll material facts set forth in the statement required to be served by the moving party will be deemed to be admitted." *See* M.D. Pa. L.R. 56.1.

A federal court should grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a

---

[4] The parties agree that this matter should be determined under a summary judgment standard. (Doc. 48, at 22; Doc. 51, at 9).

judgment as a matter of law." *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 278 (3d Cir. 2000). In deciding a motion for summary judgment, the court's function is not to make credibility determinations, weigh evidence, or draw inferences from the facts. *Anderson*, 477 U.S. at 249. Rather, the court must simply "determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249.

The party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion" and demonstrating the absence of a genuine dispute of any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the movant makes such a showing, the non-movant must go beyond the pleadings with affidavits or declarations, answers to interrogatories, or the like to demonstrate specific material facts which give rise to a genuine issue. Fed. R. Civ. P. 56(c); *Celotex*, 477 U.S. at 324. The non-movant must produce evidence to show the existence of every element essential to its case, which it bears the burden of proving at trial, because "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 323. Furthermore, mere conclusory allegations and self-serving testimony, whether made in the complaint or a sworn statement, cannot be used to obtain or avoid summary judgment when uncorroborated and contradicted by other evidence of record. *See Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990); *see also Thomas v. Delaware State Univ.*, 626 F. App'x 384, 389 n.6 (3d Cir. 2015) (not precedential) ("[U]nsupported deposition testimony, which is contradicted by the record, is insufficient to defeat summary judgment."); *Nat'l Labor Rel. Bd. v. FES*, 301 F.3d 83, 95 (3d Cir. 2002) ("[The plaintiff's] testimony. . . amounts to an unsupported, conclusory assertion, which we have held is inadequate to satisfy the movant's burden of proof on summary judgment").

III.    DISCUSSION

Cleo avers that all Remaining Plaintiffs agreed to resolve their claims in arbitration when they agreed to SynapseFI's terms of service. (Doc. 48, at 10-14, 24-27, 30-36). Cleo further contends that Reifer and Lenox again agreed to arbitrate their claims in 2025 when they agreed to Cleo's then-current terms of service. (Doc. 48, at 15-22, 24-30). Cleo argues in the alternative that if the Court does not stay this action pending arbitration, it should dismiss this case for improper venue because it and SynapseFi's terms of service include forum selection clauses. (Doc. 48, at 52-54). Remaining Plaintiffs counter that Cave never consented to an arbitration agreement with Cleo given that, at best, he consented to an arbitration agreement with SynapseFI and not Cleo. (Doc. 51, at 9-15). Remaining Plaintiffs further posit that Reifer and Lenox clicking "I agree" to Cleo's then-current 2025 terms of service does not subject them to arbitration because they clicked "I agree" after they already began this litigation and the screen they saw did not clearly indicate that they were agreeing to arbitrate their pending lawsuit. (Doc. 51, at 16-22). Finally, Remaining Plaintiffs argue that there are no enforceable forum selection clauses in this case. (Doc. 51, at 23).

The Court will first assess choice of law. The Court will then evaluate which agreements each plaintiff is or is not subject to and whether Cleo may enforce those agreements' arbitration or forum selection provisions.

A. CHOICE OF LAW

Cleo avers that Delaware law applies to Reifer and Lenox and California law applies to Cave because the terms of service they each agreed to contain choice of law provisions for those states. (Doc. 48, at 26-27). However, Cleo also argues that there is not a conflict of law because Pennsylvania, Delaware, and California law all require the same outcome: the Court

finding that there is a valid arbitration agreement and staying this action pending arbitration. (Doc. 48, at 27-38). Remaining Plaintiffs apply Pennsylvania law. (Doc. 51, at 7).

A "federal court in the exercise of diversity jurisdiction must apply the same choice-of-law rules that [the forum state's] state courts would apply if they were deciding the case." *Ferens v. John Deere Co.*, 494 U.S. 516, 519 (1990). In matters of contract, the forum state applies its own law unless the contract has a choice of law provision. *Williams v. Medley Opportunity Fund II, LP*, 965 F.3d 229, 238 (3d Cir. 2020). Under Pennsylvania choice of law principles, "[i]f there is no conflict, then the district court sitting in diversity may refer interchangeably to the laws of the states whose laws potentially apply." *Huber v. Taylor*, 469 F.3d 67, 74 (3d Cir. 2006); *see also Hine v. LendingClub Corp.*, No. 2:22-CV-00362, 2023 WL 8113234, at *7 n.3 (W.D. Pa. Nov. 22, 2023) (finding "[w]hile the parties cite to Pennsylvania contract law in their briefs, the Agreements contained a Delaware choice of law provision" but further determining "Delaware law is not in conflict with the laws of Pennsylvania on the arbitrability of clickwrap agreements. Therefore, the Court need not make a choice of law determination and will apply the law of Pennsylvania – the forum state, which is consistent with the parties' submissions"). However, when there is a choice-of-law dispute regarding an issue where the relevant state laws differ, the Court must apply Pennsylvania choice-of-law doctrine to determine which state's laws govern the controversy. *See Huber*, 469 F.3d at 74.

Here, there does not appear to be a conflict of law. According to Cleo, California, Delaware, and Pennsylvania law all require the Court to grant the motion to stay pending arbitration. (Doc. 48, at 27-38). Plaintiffs rely on Pennsylvania law, but do not present any arguments as to why Pennsylvania law requires a unique outcome. (Doc. 51). This Court previously stayed this matter pending the outcome of the Pennsylvania Supreme Court's

11

review of the Pennsylvania Superior Court's decision in *Chilutti v. Uber Technologies Inc.*, 300 A.3d 430, 449-50 (Pa. Super. 2023). (Doc. 33). *Chilutti* did appear to present a conflict of law because the Superior Court declined to adopt a multi-factor test addressing online agreements set out by the Ninth Circuit in *Berman v. Freedom Fin. Network, LLC* and adopted by courts in this circuit. 300 A.3d at 449-50; *see e.g., Wiggins v. Lab'y Corp. of Am. Holdings*, No. CV 24-0648, 2024 WL 4476646, at *8 (E.D. Pa. Oct. 11, 2024) (applying *Berman* multifactor test to establish mutual assent to online agreements); *Hine*, 2023 WL 8113234, at *7 (finding that hyperlinked terms and conditions put user on reasonable notice under *Berman*). The Superior Court held that online arbitration agreements should be held to a higher standard than other agreements due to a litigant's right to a jury trial. *Chilutti*, 300 A.3d at 449-50. However, the Supreme Court of Pennsylvania subsequently invalidated *Chilutti* and neither party argues that it should still be applied in this case. *See Chilutti v. Uber Techs., Inc.*, 349 A.3d 826 (Pa. 2026). Because *Chilutti* is no longer good law, there does not appear to be a conflict of law regarding the enforceability of arbitration agreements because Pennsylvania, Delaware, and California apply the same basic principles regarding the enforceability of contracts. *Compare Kirleis*, 560 F.3d at 160 (stating "[u]nder Pennsylvania law, contract formation requires: (1) a mutual manifestation of an intention to be bound, (2) terms sufficiently definite to be enforced, and (3) consideration"); *with Clements v. T-Mobile USA, Inc.*, 712 F. Supp. 3d 1290, 1298 (N.D. Cal. 2024), *reconsideration denied sub nom. Clements v. T-Mobile USA, Inc*, No. 5:22-CV-07512, 2024 WL 2060866 (N.D. Cal. May 8, 2024) (stating "'[u]nder California law, mutual assent is a required element of contract formation.' 'Mutual assent requires, at a minimum, that the party relying on the contractual provision establish that the other party had notice and gave some indication of assent to the contract.'" (citations omitted)); *and Cont'l Warranty, Inc. v.*

12

*Warner*, 108 F. Supp. 3d 250, 254 (D. Del. 2015) (finding contract formation requires mutual assent under Delaware law). Accordingly, no conflict exists, and the Court "may refer interchangeably to the laws of the states whose laws potentially apply." *Huber*, 469 F.3d at 74; *see also Hine*, 2023 WL 8113234, at *7 n.3.

    B.   THE ENFORCEABILITY OF THE ARBITRATION AGREEMENTS

At issue are three separate online-agreement screens. All Remaining Plaintiffs encountered the same screen in 2019 which required them to enter their contact information and click a continue button (the "2019 Screen"). (Doc. 48-3, at 6-18, 32). Lenox and Reifer also saw screens in 2025 which prompted them to press "I agree" to an updated version of Cleo's terms of service (the "2025 Screens") (Doc. 48-2, at 6-8, 95, 100). Cleo avers that under each of these screens, Remaining Plaintiffs agreed to arbitrate their claims. (Doc. 48, at 24-27). Remaining Plaintiffs counter that the 2019 Screen does not constitute a binding arbitration agreement because only SynapseFi's terms of service contained an arbitration provision, Cleo may not enforce an arbitration agreement it is not a party to, and Remaining Plaintiffs did not agree to a binding arbitration agreement with Cleo when clicking continue on the 2019 Screen. (Doc. 51, at 9-15). Remaining Plaintiffs further argue that the 2025 Screens did not create an enforceable arbitration agreement against Lenox and Reifer which could be applied to this matter since they clicked "I agree" on the 2025 Screens after this litigation began. (Doc. 51, at 16-21). For the following reasons, the Court finds that the 2019 Screen, the only screen Cave encountered, did not create a binding arbitration agreement which Cleo can enforce. However, the 2025 Screens did and thus, Lenox and Reifer are subject to arbitration.

A "clickwrap" agreement is one that "appears on an internet webpage and requires that a user consent to any terms or conditions by clicking on a dialog box on the screen in order to proceed with the internet transaction." *Feldman v. Google, Inc.*, 513 F. Supp. 2d 229, 236 (E.D. Pa. 2007) (citation omitted); *see Delaware River Waterfront Corp. v. Wellspring Software, Inc.,* No. CV 22-1905, 2022 WL 17869139 (E.D. Pa. Dec. 22, 2022) (stating "[a] clickwrap agreement 'presents users with a message on his or her computer screen, requiring the user to manifest his or her assent to the terms of the . . . agreement by clicking on an icon.'" (quoting *Specht v. Netscape Commc'ns Corp.*, 306 F.3d 17, 22 n.4 (2d Cir. 2002))); *see also Noble v. Samsung Elecs. Am., Inc.*, 682 F. App'x 113, 117 n5 (3d Cir. 2017). "Courts have also recognized a 'modified clickwrap' agreement, where terms of use are presented as part of some other transaction, such that completing the transaction also accepts the terms of use." *Dobbs v. Health IQ Ins. Servs.*, No. 21-cv-5276, 2022 WL 2974713, at *4, *8 (E.D. Pa. July 27, 2022). Courts in this circuit have found clickwrap agreements enforceable after applying traditional principles of contract law. *See, e.g., HealthplanCRM, LLC v. AvMed, Inc.*, 458 F. Supp. 3d 308, 330-31 (W.D. Pa. 2020); *see also Defillipis v. Dell Fin. Servs.*, No. 3:14-CV-00115, 2014 WL 4198015, at *6 (M.D. Pa. Aug. 22, 2014); *see also Dobbs*, 2022 WL 2974713, at *4, *8 (finding "'clickwrap' agreements manifest sufficient agreement to the terms in the contract"). However, enforcing a clickwrap agreement does not require showing a "true and actual meeting of the minds." *Am. Eagle Outfitters v. Lyle & Scott Ltd.*, 584 F.3d 575, 582 (3d Cir. 2009). Further, "an internet user need not actually read the terms and conditions or click on a hyperlink that makes them available as long as she has notice of their existence." *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 232 (2d Cir. 2016) (citation omitted); *see Hine*, 2023 WL 8113234, at *6. Still,

14

as agreements to arbitrate are matters of contract, a valid arbitration provision contained in a clickwrap agreement nonetheless requires mutual assent. *Dobbs*, 2022 WL 2974713, at *3.

Unlike clickwrap agreements, "'where users must click on an acceptance after being presented with terms and conditions . . . browsewrap agreements do not require users to expressly manifest assent.'" *HealthplanCRM, LLC*, 458 F. Supp. 3d at 331 (quoting *James v. Glob. TelLink Corp*, 852 F.3d 262, 267 (3d Cir. 2017)). In a browsewrap agreement, "a website offers terms that are disclosed only through a hyperlink and the user supposedly manifests assent to those terms simply by continuing to use the website." *Berman v. Freedom Fin. Network, LLC*, 30 F.4th 849, 856 (9th Cir. 2022). Accordingly, "browsewrap agreements are not automatically deemed valid where it is not shown that the user had *actual* notice of the agreement." *See Lloyd*, 2022 WL 18024204, at *5 (emphasis in original). As acknowledged by the Third Circuit, "[t]here is an evolving body of caselaw regarding whether the terms and conditions in browsewrap agreements are enforceable, often turning on whether the terms or a hyperlink to the terms are reasonably conspicuous on the webpage." *James*, 852 F.3d at 267. Courts are more hesitant to enforce browsewrap agreements than clickwrap agreements because customers are often unaware of a browsewrap agreement or the fact that continued use of a website "will be deemed to manifest acceptance to [a browsewrap agreement's] terms." *Berman*, 30 F.4th at 856. When determining assent in the context of a browsewrap agreement, courts are thus tasked with analyzing features of the web-based contract, including the design, colors, "textual notice," and features of the relevant interface. *See Lloyd*, 2022 WL 18024204, at *5.

All this considered, "when reviewing these routine internet transactions, 'the occurrence of mutual assent ordinarily turns on whether the consumer had reasonable notice

15

of the merchant's terms of service agreement.'" *Pricharda v. Checkr, Inc.*, No. 5:22-CV-3180, 2022 WL 16749033, at *3 (E.D. Pa. Nov. 7, 2022) (quoting *Dobbs,* 2022 WL 2974713, at *3). "To be reasonably conspicuous, a 'notice must be displayed in a font size and format such that the court can fairly assume that a reasonably prudent Internet user would have seen it.'" *Checchia*, 2023 WL 3868369, at *9 (quoting *Berman*, 30 F.4th at 856). "[W]hile it is permissible to disclose terms and conditions in a hyperlink, the fact that a hyperlink is present must be readily apparent," which is often indicated by the hyperlink being blue, "the color typically used to signify the presence of a hyperlink." *Berman*, 30 F.4th at 854, 856. Additionally, courts have looked to the proximity of the hyperlink to the assent button and whether the website design distracts from notice of the agreement. *See Starke v. SquareTrade, Inc.*, 913 F.3d 279, 292 (2d Cir. 2019); *see also Berman*, 30 F.4th at 857. Finally, courts must ascertain whether the notice "explicitly notif[ies] a user of the legal significance of the action she must take to enter into a contractual agreement." *Berman*, 30 F.4th at 858. To do this, the agreement must "indicate to the user what action would constitute assent to [the relevant] terms and conditions." *Berman*, 30 F.4th at 858. A webpage may do this by including language such as "'[b]y clicking the Continue >> button, you agree to the Terms & Condition.'" *Berman*, 30 F.4th at 858 (quoting *Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 78 (2d Cir. 2017)); *see also Coulter v. Experian Info. Sols., Inc.*, No. CV 20-1814, 2021 WL 735726, at *5 (E.D. Pa. Feb. 25, 2021) (finding the language "[b]y clicking 'Submit Secure Order': [the user] accept[s] and agree[s] to [the website's] Terms of Use Agreement" sufficient to put the user on notice of the legal significance of clicking a button); *see also Godun v. JustAnswer LLC*, 135 F.4th 699, 713 (9th Cir. 2025) (finding an online agreement that "fails to 'indicate to the user what action would constitute assent' is not enough to invite an unambiguous manifestation of assent") (citing

16

*Berman*, 30 F.4th at 858); *see also Childs v. Fitness Int'l LLC*, No. 2:22-CV-05196, 2023 WL 3594180, at *3 (E.D. Pa. May 22, 2023) (finding an online agreement unenforceable where it failed to state what action constituted assent).

Because whether a party may enforce an online agreement turns on the content of the webpage/screen displaying the agreement, the Court must assess each screen at issue.

Remaining Plaintiffs all encountered the 2019 Screen pictured below:



(Doc. 48-3, at 6-18, 32).

This webpage does not subject Remaining Plaintiffs to either Cleo or SynapseFi's terms of service because it does not "indicate to the user what action would constitute assent to [each set of] terms and conditions." *Berman*, 30 F.4th at 858. The relevant text states "SynapseFI is our backend software provider, and partner of Evolve Bank & Trust (Evolve), member FDIC. SynapseFI's API, and their relationship with Evolve, enables us to offer banking services and products. By agreeing to Cleo's TOS and Privacy Policy, you also agree to SynapseFi's terms and policies below." (Doc. 48-3, at 32). This disclosure states that users agree to SnyapseFi's terms and policies by agreeing to Cleo's TOS and Privacy Policy, but does not state what action constitutes agreeing to Cleo's TOS and Privacy Policy. (Doc. 48-

3, at 32). The page does not provide any statements such as "by clicking continue you agree to Cleo's TOS" or even state generally that "by continuing you agree to Cleo's TOS." (Doc. 48-3, at 32). Accordingly, Cleo cannot enforce any terms of service linked to in the 2019 Screen because the screen did not inform Remaining Plaintiffs of what action would constitute assent to such an agreement. *See Berman,* 30 F.4th at 858; *see also Godun,* 135 F.4th at 713; *see also Childs,* 2023 WL 3594180, at *3. Because the 2019 Screen was the only screen Cave encountered, the Court **DENIES** Cleo's motion to stay this matter pending arbitration as to Cave's claims. (Doc. 47).

However, the Court finds that the 2025 Screens subject Lenox and Reifer to enforceable agreements.  On April 28, 2025, Lenox saw the below screen:



(Doc. 48-2, at 6-7, 95).

On September 10, 2025, Reifer saw the below screen:



(Doc. 48-2, at 7-8, 100).

The 2025 Screens displayed all of Cleo's then-current terms and conditions on a scrollable screen. (Doc. 48-2, at 6, 8, 95, 100). Users also did not have to scroll down through the agreement to determine that it contained an arbitration agreement because above the box stating "I agree," the 2025 Screens both stated "[b]y clicking 'I agree,' I've read and agree to be bound by Cleo's Terms and Conditions which includes, among other provisions, a binding arbitration clause and a waiver of class action rights." (Doc. 48-2, at 95, 100). This language explicitly notifies users the users of the legal significance of clicking "I agree" and unambiguously flags that the terms of service contain an arbitration agreement. (Doc. 48-2, at 95, 100). Because of this, "a reasonably prudent [smartphone, tablet, or computer] user

would understand that the [an arbitration agreement was] connected to" clicking "I agree" and the 2025 Screens constitute enforceable arbitration agreements. *Meyer*, 868 F.3d at 78; *see Checchia*, 771 F. Supp. 3d at 612.

Remaining Plaintiffs argue that Cleo cannot enforce Reifer and Lenox's new agreements "because Plaintiffs did not intend to waive their right to pursue their claims in this Court by accessing Cleo's app . . . [n]or could they have reasonably known they were doing so, as Cleo's new terms do not reference this case or say their venue or arbitration provisions apply to this case." (Doc. 51, at 16-17). However, the arbitration agreement Lenox agreed to stated "[y]ou and the Cleo Parties ('we,' 'us,' and 'our' for purposes of this Section 21) agree that the sole and exclusive forum and remedy for resolution of a Dispute, after informal Dispute resolution has been exhausted shall be final and binding arbitration." (Doc. 48-2, at 43). The agreement further clarified that the arbitration provision applied to "any past, present, or future dispute or controversy involving you (or persons claiming through or connected with you), on the one hand, and us on the other hand arising out of this Agreement, and/or the activities or relationships that involve, lead to, or result from this Agreement." (Doc. 48-2, at 43). Thus, the terms of service explicitly informed Lenox that its arbitration provision applied to past controversies. (Doc. 48-2, at 43). Likewise, the arbitration provision Reifer clicked "I agree" to stated:

> You and the Cleo Parties ("we," "us," and "our" for purposes of this Section 21) agree that the sole and exclusive forum and remedy for resolution of a Dispute, after informal Dispute resolution has been exhausted, shall be final and binding arbitration pursuant to this Section 21 (the "Arbitration Provision"), unless you opt out as provided below. As used in this Arbitration Provision, "Dispute" shall include any past, present, or future dispute or controversy involving . . . , on the one hand, and us on the other hand, relating to or arising out of this Agreement, and/or the activities or relationships that involve, lead to, or result from this Agreement, including without limitation

20

your use of the Site and Services and any interactions or transactions between you and us.

(Doc. 48-2, at 66).

The provision further warned Reifer, in all capital letters, that "THIS PROVISION REQUIRES ALL DISPUTES BETWEEN YOU AND US TO BE ADJUDICATED IN A BINDING ARBITRATION AND ON AN INDIVIDUAL BASIS. THIS MEANS THAT YOU WAIVE YOUR RIGHT TO HAVE SUCH DISPUTES HEARD IN A COURT BY A JUDGE OR JURY, OR ADJUDICATED ON A CLASS OR REPRESENTATIVE BASIS." (Doc. 48-2, at 66). Both agreements also allowed users to opt-out of the arbitration provision via email within sixty days of clicking "I agree" but neither Lenox nor Reifer sent a timely email opting out of the arbitration provision. (Doc. 48-2, at 7-8, 44, 67-68). Thus, contrary to Remaining Plaintiffs' assertions, the provisions clearly informed users 1) that the provisions applied to past disputes, 2) that the provisions waived users' rights to proceed in a court of law prior to arbitration, and 3) afforded users the opportunity to opt out of the provision which Lenox and Reifer did not take. (Doc. 48-2, at 7-8, 43-44, 66-68).

Remaining Plaintiffs also argue that the Court should decline to enforce the arbitration agreements pursuant to Federal Rule of Civil Procedure 23(d) because Cleo "engage[d] in behavior that is misleading or threatens the fairness of the litigation" when subjecting Lenox and Reifer to these agreements. (Doc. 51, at 17) (quoting *Vargison v. Paula's Choice, LLC*, No. 25-2452, 2026 WL 483318, at *1 (9th Cir. Feb. 20, 2026) (nonprecedential)).

Federal Rule of Civil Procedure Rule 23(d) provides:

(1) In General. In conducting an action under this rule, the court may issue orders that:

    (A) determine the course of proceedings or prescribe measures to prevent undue repetition or complication in presenting evidence or argument;

21

(B) require--to protect class members and fairly conduct the action--giving appropriate notice to some or all class members of:

(i) any step in the action;

(ii) the proposed extent of the judgment; or

(iii) the members' opportunity to signify whether they consider the representation fair and adequate, to intervene and present claims or defenses, or to otherwise come into the action;

(C) impose conditions on the representative parties or on intervenors;

(D) require that the pleadings be amended to eliminate allegations about representation of absent persons and that the action proceed accordingly; or

(E) deal with similar procedural matters.

Fed. R. Civ. P. 23

Remaining Plaintiffs cite to caselaw applying Rule 23(d) against defendants who "engage[d] in misleading or unfair litigation conduct" or otherwise intentionally interfered with the litigation when presenting class action plaintiffs with arbitration agreements after litigation had begun. (Doc. 51, at 17) (citing *Vargison*, 2026 WL 483318, at *1). Remaining Plaintiffs' cited cases all involved defendants who misled plaintiffs or otherwise took intentional actions to circumvent ongoing litigation. (Doc. 51, at 17-18); *see Avery v. TEKsystems, Inc.*, 165 F.4th 1219, 1232 (9th Cir. 2026) (affirming a district court's refusal to enforce an arbitration agreement pursuant to Rule 23(d) where the record "clearly demonstrate[d] the misleading nature of [the defendant's] communications and its harmful impact on potential class members"); *see also Dominguez v. Better Mortg. Corp.*, 88 F.4th 782, 792 (9th Cir. 2023) (finding that a district court can void an "agreement obtained through misleading or coercive communications"); *see also In re Currency Conversion Fee Antitrust Litig.*, 361 F. Supp. 2d 237, 252 (S.D.N.Y. 2005) (voiding an arbitration agreement where the defendants included an arbitration clause for the purpose of eliminating putative class members' rights after litigation

commenced); *see also Greystone Mortg., Inc. v. Equifax Workforce Sols. LLC*, No. CV 24-2260, 2026 WL 447163, at *13 (E.D. Pa. Feb. 17, 2026) (same). In fact, in *Vargison v. Paula's Choice, LLC*, No. 25-2452, 2026 WL 483318, at *1 (9th Cir. Feb. 20, 2026), a case which Remaining Plaintiffs cite, the Ninth Circuit reversed a district court's invalidation of a post-litigation arbitration agreement because "the district court abused its discretion when it invalidated the arbitration clause without any specific findings that [the defendant] engaged in misleading or unfair litigation conduct."

Remaining Plaintiffs present no evidence that Cleo engaged in misleading or otherwise unfair conduct. The 2025 Screens were not targeted specifically at Lenox and Reifer but were directed at all Cleo users who had not yet accepted Cleo's then-current current terms of service. (Doc. 48-2, at 6, 8). Cleo has incorporated arbitration provisions and class action waivers into its terms of service since 2021, long before this action began, and the 2025 Screens reflect Cleo continuing to follow the same practices it has followed since 2021. (Doc. 52-2, at 3, 44-45). Thus, there is no evidence that Cleo intentionally added arbitration agreements for the purpose of thwarting this litigation. There is also no evidence that Cleo misled users into signing an arbitration agreement. In fact, the 2025 Screens and updated terms of service suggest that Cleo took additional steps to make it very clear to users that its terms of service contained an arbitration provision and a class action waiver by flagging those provisions above its "I agree" button and including an opt-out provision. (Doc. 48-2, at 7-8, 44, 67-68, 95, 100). Despite being involved in an action in which the parties heavily litigated the issue of online agreements, Lenox and Reifer chose to use the App again and click "I agree" to an online agreement. (Doc. 48-2, at 6-8). The fact that Lenox and Reifer may not have read Cleo's updated terms despite the nature of this action does not invalidate the provisions. *See*

*Feldman*, 513 F. Supp. 2d at 236 (stating "[a]bsent a showing of fraud, failure to read an enforceable clickwrap agreement, as with any binding contract, will not excuse compliance with its terms"); *see also Keller v. Pfizer, Inc.*, No. 1:17-CV-1883, 2018 WL 5841865, at *4 (M.D. Pa. Nov. 8, 2018) (finding an arbitration agreement enforceable regardless of whether the plaintiff read the agreement or could remember the terms). Accordingly, the Court **GRANTS** Cleo's motion to stay this matter pending arbitration regarding Lenox and Reifer's claims. (Doc. 47).

C.  THE AGREEMENTS' FORUM SELECTION CLAUSES

Because the Court denies Cleo's motion to stay this matter pending arbitration regarding Cave, the Court must consider Cleo's alternative motion to dismiss for improper venue. (Doc. 47; Doc. 48, at 52-54). Cleo argues that venue is improper because Cave agreed to terms of service containing a forum selection clause designating California as the appropriate venue. (Doc. 48, at 52-54). Remaining Plaintiffs argue that the relevant forum selection clause is in SynapseFi's terms of service which Cleo cannot enforce. (Doc. 51, at 23-24).

"Where the parties to a contract 'have specified the forum in which they will litigate disputes arising from their contract, federal courts must honor the forum-selection clause '[i]n all but the most unusual cases.'" *Olde Homestead Golf Club v. Elec. Transaction Sys. Corp.*, 714 F. App'x 186, 188 (3d Cir. 2017) (nonprecedential) (quoting *In re: Howmedica Osteonics Corp*, 867 F.3d 390, 397 (3d Cir. 2017)). However, for a forum-selection clause to be enforced, the parties must be subject to a valid contract. *See Feldman*, 513 F. Supp. 2d at 235 (first determining whether the parties were subject to an enforceable clickwrap agreement before determining that a forum selection clause was enforceable); *see also Live Face on Web, LLC v.*

24

*Complete Fam. Dentistry, P.C.*, No. CV 16-7, 2016 WL 8813993, at *3 (W.D. Pa. Nov. 18, 2016) (declining to enforce a forum selection clause because an online agreement did not provide reasonable notice of or mutual assent to the agreement). Where a forum selection clause is in a clickwrap or browsewrap agreement, the court must assess whether the parties assented to the agreement. *See Feldman*, 513 F. Supp. 2d at 235-35 (assessing whether an online agreement provided sufficient notice to constitute mutual assent); *see also Live Face on Web, LLC*, 2016 WL 8813993, at *3 (same); *Liberty Syndicates at Lloyd's v. Walnut Advisory Corp.*, No. CIV.A. 09-1343, 2011 WL 5825777, at *4-5 (D.N.J. Nov. 16, 2011) (same).

Here, the Court may not enforce SynapseFi's forum selection clause against Cave for the same reason it may not enforce the arbitration provision: Cave did not assent to the terms of the agreement. *See Live Face on Web, LLC,* , 2016 WL 8813993, at *3 (declining to enforce a forum selection clause because an online agreement failed to provide sufficient notice to create mutual assent); *Liberty Syndicates at Lloyd's,* 2011 WL 5825777, at *4-5 (same). Accordingly, the Court **DENIES** Cleo's alternative motion to enforce SynapseFi's forum selection clause and dismiss for improper venue. (Doc. 47).

## IV.    CONCLUSION

For the foregoing reasons, Cleo's motion to stay this matter pending arbitration is **GRANTED in part** and **DENIED in part**. (Doc. 47). Cleo's motion is **GRANTED** regarding Lenox and Reifer's claims, and the Court **STAYS** this matter pending arbitration as related to those claims. However, the Court **DENIES** Cleo's motion regarding Cave and Cave may proceed with his claims. An appropriate Order follows.

**Dated: May 29, 2026**

*s/ Karoline Mehalchick*
**KAROLINE MEHALCHICK**
**United States District Judge**

25